## Case No. 179.

### The ALEXANDRIA.

### BYRNES v. The ALEXANDRIA.

[8 Reporter, 390.]

Circuit Court, S. D. New York. July 3, 1879.[1]

COLLISION—BETWEEN STEAM AND SAIL—DUTY TO STOP OR CHANGE COURSE — INTEREST ON JUDGMENT.

[1. Where a steamer bound for the open sea observes a bark less than a mile distant apparently getting under way, but drifting across the steamer's bow from starboard to port, and the steamer puts her helm to starboard, and keeps on at full speed, she is liable for the resulting collision if it could have been avoided by porting her helm, or by reversing or slackening her speed after sighting the bark.]

[2. In affirming a decree of the district court awarding damages for a collision, which included interest to the date of its entry, interest should be allowed only upon the damages assessed, and not upon the amount of the decree itself.]

[See Pinckney v. Singleton, 2 Hill, (S. C.) 343; In re Fuller, Case No. 5,148; Quivey v. Hall, 19 Cal. 97; Heidenheimer v. Johnston, (Tex. Sup.) 13 S. W. Rep. 46; Corcoran v. Doll, 32 Cal. 82.]

[3. Questioned in The Eloina, 4 Fed. Rep. 574, as to the effect of this decree in affirming The Alexandria, Case No. 178, in respect to the allowance of interest on demurrage.]

[In admiralty. Libel by William B. Byrnes and others, owners of the barkentine C. L. Pearson, against the steamship Alexandria, for damages sustained by collision. Decree for libelants, reported in The Alexandria, Case No. 178. Claimants appeal. Decree affirmed.]

[Facts Found by the Court.[2]

[(1) At about five o'clock in the morning of the 19th of May, 1876, the barkentine C. L. Pearson, owned by the libelants, and laden with a full cargo, started on a voyage from New York to Japan. She was of 664 tons

[1][Affirming The Alexandria, Case No. 178.]
[2][The "Facts Found by the Court," the "Conclusions of Law," and the concluding paragraph of the opinion, included within the brackets, were obtained from the records at the clerk's office.]

burthen, and her length over all was 165 feet. Her draft was about sixteen feet. A tug took her below the Narrows. The pilot left her about 9:30 in the forenoon after she got out into the open sea. The wind was light from the westward, but so long as she had the ebb tide with her she made a little headway. About 1 P. M. the captain, observing that she was drifting with the flood tide, which had then made, and that the wind had all died out, let go his kedge anchor, and, paying out forty or fifty fathoms of hawser, lay at anchor waiting for wind. Some of the sails remained set, but hanging loose against the masts, and the yards were properly braced. She lay with her head out to sea, and against the tide, which was running to the northward and westward. Her position was a very little to the southward and eastward of the fairway buoy in Gedney's channel, which is a little to the southward of the middle of the channel, and in the deepest water. The channel is about 1,200 feet wide, and the water where the vessel lay was more than 21 feet deep at mean low tide. The day was clear, and the vessel was distinctly visible many miles away in every direction. The weight of the kedge was not far from four hundred pounds. It was sufficient to hold the vessel in position as the wind and tide then were.

[(2) A little before four o'clock in the afternoon, a light breeze sprang up from the southwest, and the captain set about getting under way again. For this purpose he properly trimmed the sails that were set, and began heaving on the anchor. The tide was the last quarter of the flood, and still setting pretty strong to the northward and westward. Soon after they commenced heaving on the anchor, and when they had got twelve or fifteen fathoms of the hawser inboard, the barkentine was struck by the steamship Alexandria in her stern, a little to the starboard of the stern port, and cut into about eleven feet, and down to the water's edge, a line but slightly angling across the keel to port.

[(3) The Alexandria was a steamship of 1,623 tons burthen, about three hundred feet long, and drawing 21 ft. 6 in. She left New York at ten minutes past two that afternoon, with a full cargo, bound for Glasgow. She had a pilot on board, who continued in charge of her navigation until after the collision. The captain and pilot were on the bridge, and the second mate near by, where he could pass the orders from the bridge to the wheel. There was no lookout specially assigned to duty, but the first mate was on the forecastle, so situated that he could look out, though he was also engaged looking after his watch, who were at the time employed in cleaning up and getting the ship ready for sea. Just before the ship turned the tail of the Roemer, so as to pass from the Swash into Gedney's channel, the captain discovered the barkentine apparently at anchor. He

gave her no special attention at the time, and did not speak to the pilot about her. The vessels were then about a mile apart, and the steamer going at her usual speed of about ten knots an hour. After getting out of the Swash channel, the ship was put on a course of east by north, and this brought the barkentine a little off her starboard bow, and about three quarters of a mile away. The captain and pilot then saw the barkentine, and judged she was a little to the southward of the buoy. It is usual in going out through Gedney's channel to pass as near as is consistent with safety to the buoy. The course taken was intended to carry the ship somewhat to the northward of the buoy and of the barkentine. When the vessels were about half a mile apart the captain observed the barkentine drawing a little ahead, and her bow falling off somewhat to the eastward. No attention was paid to this movement, but when the vessels were only a quarter of a mile or thereabouts apart, and when the barkentine appeared to be drifting to the northward and westward, the helm was starboarded, still with the intention of passing her to the north. A little later, when the barkentine seemed to be drifting further across the bow of the steamer, the wheel was put hard to starboard, and the engine stopped and backed. When this last movement was made the vessels were not more than five hundred feet apart, and the collision could not in that way be avoided. The steamer could not have been stopped in going less than nine hundred feet.

[(4) Had the wheel been ported, instead of starboarded, when the change in the position of the barkentine was first discovered, or had the engine been stopped until the actual movement of the barkentine was ascertained, the collision would not have occurred.

[(5) The damages sustained by the libelants, as found by the district court, and not objected to on the appeal, amount to $13,189.22, as of July 2, 1878.

· [Conclusions of Law.

[(1) That the collision was caused solely by the fault of the Alexandria.

[(2) That a decree should be given in favor of the libelants for the sum of $13,189.22, and interest from July 2, 1878, at the rate of six per cent. per annum, or so much thereof as is not for interest allowed by the commissioner in stating his account or by the court.]

E. H. Nicoll, for libelants.
Scudder & Carter, for claimants.

WAITE, Circuit Justice.[3] I have no doubt whatever of the liability of the steamship

[3] [This cause was heard by Mr. Chief Justice Waite, holding the circuit court for the southern district of New York, pursuant to Rev. St. § 617, at the request of Mr. Justice Hunt, allotted to the second circuit.]

for this collision. It happened in broad daylight, when there was no wind, and nothing to prevent her keeping out of the way, as it was her duty to do, if those in charge of her navigation had acted with ordinary prudence and foresight. The fact that the barkentine was lying at anchor in such a place, with her sails set, was evidence to the mind of a skilful navigator that she was waiting for the wind, and would be likely to get under way as soon as she could. The tide was running to the northward and westward, so as to carry the drift in that direction. The wind also, which met the steamer just before she came out of the Swash channel, was from the southwest. Under these circumstances any one at all acquainted with navigation ought to have known that, when the barkentine did attempt to get under way, she would almost necessarily drift somewhat in the direction of the wind and tide before her sails could draw so as to take her ahead. When, therefore, the captain of the steamer, half a mile away, saw the barkentine first heaving ahead, then swinging her bow off to the northward, and finally drifting bodily somewhat in the same direction, he ought to have known she was getting under way, and governed himself accordingly. Had he, when he first discovered that the vessel was in motion, ported his wheel, stopped his engine, or even slackened his speed, there probably would have been no collision. Instead of that, he starboarded, and kept on at full speed, until it was impossible to keep the vessels from coming together. It needs no argument to show that this was the very worst thing that could have been done, if, as the captain of the steamer says, the barkentine was drifting rapidly to the northward and crossing his bows. In this, however, I think he is mistaken, and that the collision actually occurred by reason of an attempt on the part of the steamer, when she set her course originally, to pass too near. Undoubtedly the barkentine drifted somewhat to the northward, but it could not have been far. Between the time the captain first discovered her in motion and the collision was not to exceed three minutes. The steamer, going at ten knots an hour, only went half a mile. The drawing ahead which was first seen undoubtedly began with the heaving on the anchor. As soon as the hawser shortened, so as to weaken the hold of the anchor, the drift may have commenced under the combined action of the wind and tide, but the movement could not have been very great, for so long as the anchor was on the ground, while it might not keep the vessel in place, it would to a greater or less extent retard her progress. That it was on the ground is shown by the fact that the hawser was cut when the steamer took the barkentine in tow. Under such circumstances the drifting of the vessel ought not to have embarrassed the steamer, and it is clear to my mind that

the collision was caused alone by her unskilful and careless navigation. The kedge anchor, though light, was sufficient to hold the barkentine in place with the wind and tide as they were. It was, therefore, not a fault to put that out instead of a heavier one. It was only when they commenced heaving the anchor in, that the drift commenced, and that ought to have been allowed for by the steamer when she made her calculations for passing. There was plenty of room on both sides, and a prudent navigator would have gone far enough away to have avoided all chances of danger by any movement of the vessel while getting under way.

No objection is made here to the amount of the decree in the district court. That, therefore, may be taken as the basis of the decree here, adding interest from the date of that decree only on the amount of the damages, exclusive of the interest allowed below. A decree may be prepared for the libelants.][1]

